**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER CARNELL and DAVID WORTH BOWMAN,<br>Defendants. |

Criminal Case No. 23-139

Judge Beryl A. Howell

**MEMORANDUM OPINION**

Defendants Christopher Carnell and David Worth Bowman were convicted, following a trial based on stipulated facts on February 12, 2024, on all counts of a six-count indictment, including violation of 18 U.S.C. §§ 1752(a)(1) (Count Two) and (a)(2) (Count Three), along with three other misdemeanor offenses and one felony offense.[1] In advance of the stipulated trial, defendants moved to dismiss Counts Two and Three, Defs.' Mot. Dismiss Counts Two and Three ("Defs.' MTD"), ECF No. 53; Def. Carnell's Mot. to Adopt and Join Co-Def.'s Mot., ECF No. 56; Minute Order (Dec. 28, 2023) ("permitting defendant to join co-defendant['s] . . . Motion to Dismiss Counts Two and Three"), which allege that defendants "did knowingly enter and remain in a restricted building and grounds . . . without lawful authority to do so," in violation of 18 U.S.C. § 1752(a)(1), and that defendants "did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive

---

[1] These offenses include: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six). *See* Indictment at 1–3. Defendants' prior motions to dismiss Count One, Defs.' Mot. Dismiss Count One, ECF No. 34, and "in limine . . . to establish the elements of 18 U.S.C. § 1512(c)(2)," Defs.' Mot. *in Limine*, ECF No. 43, were denied, *see* Mem. and Order, ECF No. 79.

1

conduct in and within such proximity to, a restricted building and grounds . . . when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions," in violation of 18 U.S.C. § 1752(a)(2). Indictment at 2, ECF No. 22. Defendants' convictions stem from their offense conduct, on January 6, 2021, at the U.S. Capitol and grounds after they attended a rally and heard former President Donald J. Trump speak. Upon arriving at the Capitol grounds, defendants made their way through the breached Senate Wing doors into the U.S. Capitol Building, joining the crowd in overwhelming police inside the Crypt and, again, in the Rotunda, before spending about six minutes on the floor of the Senate Chamber, when that entire area was "a restricted building and grounds" where "the Vice President was and would be temporarily visiting." *Id.*; Carnell's Statement of Facts and Elements for Stipulated Trial ("Carnell's SOF") ¶¶ 15–19, 21, ECF No. 76-1; Bowman's Statement of Facts and Elements for Stipulated Trial ("Bowman's SOF") ¶¶ 15–19, 23, ECF No. 76-2 (where identical, cited as "Defs.' SOF").

Defendants seek dismissal of Counts Two and Three, under Federal Rules of Criminal Procedure 12(b)(3)(B)(iii) and (b)(3)(B)(v), on grounds that these two Class A misdemeanor charges lack specificity, fail to state an offense and are violative of the Fifth Amendment's Due Process clause under the U.S. Constitution. *See generally* Defs.' MTD. Relatedly, defendants raise additional arguments in another motion—which, though styled as a motion *in limine,* does not seek guidance on what evidence would be admissible at trial and instead proposes jury instructions normally addressed at a charging conference—for the Court "to define terms subject to dispute between the parties and to establish the elements of 18 U.S.C. § 1752 for Counts Two and Three." Defs.' Mot. *in Limine* for Counts Two and Three ("Defs.' MIL"), ECF No. 42; Minute Order (Dec. 28, 2023) ("permitting defendant [Bowman] to join co-defendant['s] [] Motion *In*

2

*Limine* for Counts Two and Three"). Defendants preserved their right to appeal their convictions on Counts Two and Three, as well as on Count One, which charges a violation of 18 U.S.C. §§ 1512(c)(2) and 2. *See supra* n.1; Bowman's SOF ¶¶ 30–31; Carnell's SOF ¶¶ 23–24; Parties' Jt. Submission Preserv. Appeal Rights on Section 1752 Counts at 1–2, ECF No. 92; Agreement and Waiver of Jury Trial Rights at 2, ECF No. 96.

Defendants' motion to dismiss and motion *in limine* as to Counts Two and Three were denied orally at the trial on stipulated facts, with the explanation for that decision to follow shortly. That explanation is set out in this Memorandum Opinion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The parties stipulated, as supplemented with evidence submitted as exhibits by the government, that on January 6, 2021, defendants were among those who "traveled . . . to Washington, D.C. . . . to attend a rally at the Ellipse that featured speeches from individuals including former President Donald Trump." Defs.' SOF ¶ 11; Gov't's Ex. 12.1 (video of defendants attending portion of former President Trump's rally at the Ellipse, with Trump's voice clearly audible). Meanwhile, "a joint session of the United States Congress convened at the Capitol" to "certify the vote count of the Electoral College of the 2020 Presidential Election," with "Vice President Pence present and presiding over the Senate." Defs.' SOF ¶¶ 3–4. "Restrictions around the Capitol include[d] permanent and temporary security barriers and posts manned by" U.S. Capitol Police ("USCP"), with "[o]nly authorized people with appropriate identification [] allowed access inside," *id.* ¶ 1, and "the exterior plaza of the Capitol [] closed to members of the public," *id.* ¶ 2.[2]

---

[2]    The stipulated facts make no reference to input by and consultation with the U.S. Secret Service ("USSS") in setting the restrictions put in place on January 6, 2021 at the U.S. Capitol building and grounds, *see generally* Defs.' SOF, though such testimony has been presented at other trials related to the same event, *see, e.g.*, Testimony of U.S. Secret Service Inspector Lanelle Hawa, Rough Tr. of Trial at 69–70, *United States v. Todd*, No.

3

"After attending the rally," *id.* ¶ 12, defendants "enter[ed] the restricted area on [the] Capitol Grounds," *id.* ¶ 13.[3] "Temporary and permanent barricades . . . were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside." *Id.* ¶ 4. Defendants "climbed through scaffolding on the northwest side of the Capitol" and "walked across the Northwest Courtyard toward the Senate Wing Door" while "a group of uniformed officers were visibly protecting another entry point into the Capitol Building." *Id.* ¶¶ 13–14; *see also* Gov't's Exs. 13–14 (images of defendants amassed by U.S. Capitol scaffolding and crossing Northwest Courtyard). Undeterred, defendants "entered the Capitol with no lawful authority through the Senate Wing Door," as "the Building's alarm system was audibly blaring" and minutes after "other rioters had smashed in the windows flanking the Senate Wing Doors, rendering the windows visibly shattered." Defs.' SOF ¶ 15; *see also* Gov't's Ex. 15.1 (CCTV footage of defendants' entry through Senate Wing Doors).

---

22-cr-166 (D.D.C. Jan. 31, 2024) (testifying that in anticipation of January 6, 2021, Hawa, as part of the Secret Service liaison division, "work[ed] with U.S. Capitol Police counterparts" regarding "establishing a security perimeter" around the Capitol and "ensur[ing] that safety protocols were in place" for Secret Service protectees "Vice President Pence and his family members" and others who would be present at the U.S. Capitol that day). Here, the government acknowledged that the stipulated facts "don't explicitly state that the Secret Service was involved in designating the areas as 'restricted,'" but that the stipulated facts state that the Capitol grounds had been "properly restricted." Rough Tr. of Stipulated Trial at 12 (Feb. 12, 2024); *see, e.g.*, Defs.' SOF ¶ 1 ("Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.").

[3] Neither the stipulated facts nor the government's exhibits admitted at trial contain the statements made by former President Trump at the Ellipse rally, expressly talking about former Vice President Pence and his role and presence at the Capitol on January 6, 2021, *see generally* Defs.' SOF; Gov't's Ex. List, ECF No. 83, though such testimony has been presented at other trials related to the same event, *see, e.g.*, Audio File: CSPAN Footage of Donald J. Trump Speech on Jan. 6, 2021, Gov't's Ex. 312.1, *United States v. Todd*, No. 22-cr-166; *see also* Gov't's Ex. List, *United States v. Todd*, No. 22-cr-166, ECF No. 209-1 (D.D.C. Feb. 7, 2024). Here, the government represented that defendants were at the rally minutes before and after the former President spoke about former Vice President Pence, and posited that the Court "[could] infer . . . that [defendants] knew leading up to January 6 and before they even entered restricted grounds that they were aware of the Vice President's presence on the grounds." Rough Tr. of Stipulated Trial at 9–10 (citing Gov't's Ex. 12.1).

Defendants then went to the Crypt and joined a crowd "as it overwhelmed the USCP officers who were attempting to prevent the rioters from entering further into the Capitol." Defs.' SOF ¶ 16; *see also* Gov't's Ex. 16.1 (video of defendants joining crowd in Crypt). From there, defendants "traveled into and through the Capitol Rotunda and joined a crowd as it amassed near the Rotunda Door," Defs.' SOF ¶ 17, where Carnell "join[ed] the crowd as they chanted," repeatedly, "'treason,'" Criminal Compl., Statement of Facts ("SOF") at 7, ECF No. 1-1; *see also* Defs.' SOF ¶ 17. At 2:41 p.m., defendants "ascended the Rotunda Lobby East Stairs" and "observed other rioters physically attacking a female journalist." Defs.' SOF ¶ 18. Nevertheless, defendants persisted in remaining in and traversing inside the Capitol building.

Nearly ten minutes later, at 2:49 p.m., defendants "unlawfully enter[ed] the Senate floor." Criminal Compl., SOF at 6; *see also* Gov't's Ex. 19.1 (image of defendants' entry onto Senate floor). Bowman "understood that Vice President Pence and the Senators needed to 'determine something that would've been very consequential for Trump–that's why things were so heated' that day," though he "believed the certification to be occurring in the House chamber." Bowman's SOF ¶ 19; *see also* Gov't's Ex. 28 (excerpt of audio recording of Bowman's statements during December 2022 interview with the FBI). Nevertheless, while in the Senate chamber, "other rioters were loudly discussing that the 'chair' on the Senate Dais 'belongs to the Vice President of United States when he's in here,' to which one rioter responded, 'they can steal our election but we can't sit in their chairs?!" Defs.' SOF ¶ 19; *see also* Gov't's Ex. 19.3 (video capturing rioters' discussion).

"At or around 2:55 p.m., [defendants] left the Senate chamber" and, after being "directed to exit the Capitol by uniformed law enforcement officers," at 2:56 p.m., they "left the Capitol through the Senate Carriage Door." Carnell's SOF ¶ 21; Bowman's SOF ¶ 23.

"Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber" around 2:20 p.m., "until the [joint] session [to certify the vote count] resumed." Defs.' SOF ¶ 7. Given the "dangerous circumstances caused by the unlawful entry to the Capitol . . . Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured," which did not occur before "approximately 8:00 p.m." *Id.*

Two days later, in a text message conversation with three individuals with whom Bowman had corresponded leading up to and on January 6, 2021, including Carnell and another individual, Aiden Henry Bilyard, Bowman texted a "link to a news story including an image taken from the Senate floor on January 6, 2021." Bowman's SOF ¶¶ 9, 26; *see also* Gov't's Exs. 26–27 (photo of text message).[4] Asked whether he had gotten "inside," Bowman's SOF ¶ 27, Bowman replied, "if I was buying textbooks for next semester, I would have hypothetically gotten into the book store and even walk[ed] the checkout floor where all the professors usually buy books and sometimes choose what books their students would read," *id.* ¶ 27 (brackets in original); *see also* Gov't's Exs. 26–27. In response to Bilyard's message stating, "what you're saying is that you got into a private library of sorts," Bowman answered, "In Minecraft school yes[.] But no[.]" Bowman's SOF ¶ 28 (brackets in original); *see also* Gov't's Exs. 26–27. This exchange supports an inference that Bowman attempted to conceal his admissions and presence at the Capitol, repeating, "please delete this group text," Bowman's SOF ¶ 26, "delete the chat because it's funny," *id.* ¶ 27, and "[d]elete all of this for fun," *id.* ¶ 28; *see also* Gov't's Exs. 26–27. About one year following January 6, 2021, "Bowman deleted images from his cell phone," Bowman's SOF ¶ 29; *see also* Gov't's Ex. 19.2 (audio recording of FBI interview of Bowman during which

---

⁴ Bilyard was subsequently sentenced to a period of incarceration for his unlawful conduct at the U.S. Capitol, *see* Judgment, *United States v. Bilyard*, No. 22-cr-34 (RBW), ECF No. 54 (D.D.C. Mar. 23, 2023).

Bowman admitted to having deleted the photos), further supporting the inference that Bowman was aware of the unlawfulness of his conduct on January 6, 2021.

Following their arrest in March 2023, *see* Arrest Warrant Return As to Christopher Carnell (Mar. 2, 2023), ECF No. 5; Arrest Warrant Return As to David Worth Bowman (Mar. 6, 2023), ECF No. 6, defendants were indicted, in April 2023, and each charged with one felony and five misdemeanor charges, including the two challenged charges, under 18 U.S.C. § 1752 (a)(1) and (2), for allegedly engaging in criminal conduct in a "restricted building and grounds," Indictment at 1–3.

A trial date was set for February 12, 2024, *see* Minute Entry (Aug. 11, 2023), and, at the parties' request, was converted from a jury trial to a trial on stipulated facts, *see* Parties' Jt. Mot. to Convert to Stipulated Trial and to Vacate All Remaining Pre-Trial Deadlines, ECF No. 76; Minute Order (Jan. 7, 2024). With the parties' consent, ten pending pretrial motions were then denied as moot. *See* Parties' Resp. to Court's Show Cause Order, ECF No. 81; Minute Order (Jan. 10, 2024) (denying as moot defendants' pretrial motions).[5] During the stipulated trial on February 12, 2024, this Court orally denied arguments raised in the two remaining defense motions addressed in this Memorandum Opinion, and scheduled a sentencing date for June 14, 2024. *See* Minute Entry (Feb. 12, 2024). As already noted, this Memorandum Opinion sets out the reasons for denial of defendants' motions for dismissal of Counts Two and Three.

---

[5] The motions denied as moot include: (1) defendant Carnell's Motion *in Limine* to Exclude Generalized, Sweeping, Non-Particularized January 6 Evidence, ECF No. 44, which defendant Bowman joined, *see* Minute Order (Dec. 28, 2023); (2) defendants' Motion to Sever, ECF Nos. 45, 47; (3) defendant Bowman's Motion to Retain Rough Notes and Emails, ECF No. 48; (4) defendant Bowman's Motion *in Limine*, ECF No. 50, which defendant Carnell joined, *see* Minute Order (Dec. 28, 2023); (5) defendant Bowman's Motion *in Limine* to Exclude Evidence Concerning Conduct by Others, ECF No. 51, which defendant Carnell joined, *see* Minute Order (Dec. 28, 2023); (6) defendant Bowman's Motion to Require Government to Designate and Produce, ECF Nos. 52, 57, which defendant Carnell joined, *see* Minute Order (Dec. 28, 2023); (7) defendant Bowman's Motion to Join Co-Defendant's Responses, ECF No. 73; (8) the government's Motion *in Limine* to Admit Certain Types of Evidence, ECF No. 54; (9) the government's Motion *in Limine* to Preclude Improper Defense Arguments and Evidence, ECF No. 55; and (10) defendant Bowman's Motion to Suppress, ECF No. 59.

## II.    LEGAL STANDARD

A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). That includes "a defect in the indictment" requiring dismissal, such as "failure to state an offense" and "lack of specificity," FED. R. CRIM. P. 12(b)(3)(B)(iii), (v), provided "the basis for the motion is [] reasonably available and the motion can be determined without a trial on the merits," FED. R. CRIM. P. 12(b)(3). In ruling on a pretrial motion to dismiss, the trial court must presume the truth of the facts alleged in the charging instrument, *see United States v. Park*, 938 F.3d 354, 358 (D.C. Cir. 2019), and may accept any "undisputed facts" proffered by the government, *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005) (explaining that "undisputed facts obviate[] the need for [a] district court to make factual determinations properly reserved for a jury" (citations omitted)). Since the authority to dismiss an indictment "'directly encroaches upon the fundamental role of the grand jury,' dismissal is granted only in unusual circumstances." *United States v. Fischer*, 64 F.4th 329, 334–35 (D.C. Cir. 2023), *cert. granted*, No. 23-5572, 2023 WL 8605748 (U.S. Dec. 13, 2023) (quoting *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015)).

## III.   DISCUSSION

Defendants argue that their alleged conduct on January 6, 2021, falls outside the scope of 18 U.S.C. § 1752 (a)(1) and (2), thereby requiring dismissal of Counts Two and Three, for three essential reasons: first, Section 1752 "requires proof that defendant[s] knew that the Vice President is or will be temporarily visiting" the Capitol on January 6, 2021, Defs.' MIL at 2–5 (capitalization omitted); Defs.' MTD at 10; *see also* Defs.' Notice Suppl. Auth., ECF Nos. 78, 93; second, that the Capitol building and grounds on January 6, 2021, did not qualify as "a restricted building or grounds," a required element of both charges, because the USCP, rather than the U.S. Secret

Service ("USSS") set the perimeter of the restricted area and the area was not "posted, cordoned off, or otherwise restricted" by "something that physically and objectively defines a perimeter or its boundaries as restricted," Defs.' MTD at 11–14; Defs.' MIL at 2; and third, that Section 1752(a)(2), charged in Count Three, requires proof that defendants' "actions were a but-for cause . . . that impeded or disrupted the orderly conduct of Government," Defs.' MIL at 5–6. Due to these purported deficiencies, defendants claim that Counts Two and Three, as applied to their conduct on January 6, 2021, are unconstitutionally vague, operate as an *ex post facto* law in violation of the Due Process clause, and fail under the rule of lenity. Defs.' MTD at 14–22. These arguments are addressed *seriatim*.

### A. Section 1752's *Mens Rea* Requirement Is Inapplicable to Secret Service Protectee's Visit

Defendants contend that, under Section 1752, a defendant must have knowledge not only that he entered a "restricted building or grounds"—either without lawful authority to do so, or with intent to and, in fact, impeding or disrupting the orderly conduct of Government business or official functions, *see* 18 U.S.C. § 1752(a)(1) and (2), respectively—but also that the specific reason for the area being "restricted" was because "the Vice President was or would be temporarily visiting." Defs.' MIL at 5. This Court is not persuaded that Section 1752 compels such an interpretation.

Section 1752 prohibits, in the charged subsections, "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so[,]" 18 U.S.C. § 1752(a)(1), and "knowingly . . . engag[ing] in disorderly or disruptive conduct in . . . any restricted building or grounds[,]" *id.* § 1752(a)(2). The phrase "restricted building or grounds" is defined, in paragraph (1) of a separate definitional subsection, as "any posted, cordoned off, or otherwise restricted area," which also must satisfy one of three alternative qualifiers. *Id.* § 1752(c)(1). These qualifiers are set out as parts of the first paragraph of subsection (c), including that an area qualifies

9

as "restricted" when it is "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting[.]" *Id.* § 1752(c)(1)(B). In other words, to qualify as a "restricted building or grounds" under Section 1752's definitional subsection, the area must be (1) "posted, cordoned off, or otherwise restricted," which amounts to a fair "notice requirement," and (2) "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" ("USSS-protectee requirement"), *id.*, or one of two alternative qualifiers, not invoked here, *see id.* § 1752(c)(1)(A), (C).

The parties do not dispute that both paragraphs (1) and (2) of Section 1752(a) require a defendant to act "knowingly" in engaging in the proscribed conduct while in a restricted area that is "posted, cordoned off, or otherwise restricted," but diverge as to whether this scienter requirement also applies to the subpart qualifiers to the first paragraph of Section 1752's definitional subsection, *id.* § 1752(c)(1)(A), (B) and (C). Defendants contend that a defendant must know not only that an area is a "restricted building or grounds" due to the fair notice provided by it being "posted, cordoned off, or otherwise restricted," *see id.* § 1752(c)(1), but also the reason for the restriction, *i.e.,* due to the presence of "the President or other person protected by the Secret Service," *id.* § 1752(c)(1)(B). Defs.' MIL at 5. The government counters that "Congress did not intend to require . . . a defendant to know why a particular area is restricted," Gov't's Opp'n Defs.' Mot. *in Limine* ("Gov't's Opp'n MIL") at 17, ECF No. 72, because the USSS-protectee requirement serves only as a jurisdictional element to which the "'knowing' scienter does not extend," Gov't's Suppl. Mem. Regarding *United States v. Groseclose* ("Gov't's Resp.") at 1–2, ECF No. 82; *see also* Gov't's Notice Add. Auth. Regarding Mens Rea Required Under 18 U.S.C. § 1752 ("Gov't's Notice Add. Auth.") at 2, ECF No. 95, as confirmed by the fact that this

requirement does not "separate wrongful from innocent acts," Gov't's Opp'n MIL at 25; Gov't's Resp. at 17.

This legal issue has produced divergent views on this Court, with several Judges, including the undersigned, finding that the "knowingly" *mens rea* requirement applies to the proscribed conduct and that such conduct occurred in an area that was fairly noticed as a "restricted building or grounds." Put another way, the government must prove, beyond a reasonable doubt, that the defendant knowingly engaged in the proscribed conduct, knowing the conduct is in a "posted, cordoned off, or otherwise restricted area," plus, for Section 1752(a)(1), knowing such conduct in that area is "without lawful authority," or, for 1752(a)(2), "with intent to impede or disrupt the orderly conduct of Government business or official functions." *See* Trial Tr. at 1199–1200, *United States v. Vo*, No. 21-cr-509 (TSC), ECF No. 130 (D.D.C. Sept. 22, 2023) (Chutkan, J.); Trial Tr. at 8, *United States v. Eicher*, No. 22-cr-38 (BAH) (D.DC. June 14, 2023) (Howell, J.); Mem. Court's Responses to Jury Questions at 4, *United States v. Rhine*, No. 21-cr-687 (RC), ECF No. 104 (D.D.C. Apr. 24, 2023) (Contreras, J.); Trial Tr. at 330–32, *United States v. Griffin*, No. 21-cr-92 (TNM), ECF No. 106 (D.D.C. Mar. 22, 2022) (McFadden, J.). By contrast, other Judges have held that the "knowingly" *mens rea* requirement applies further into subparts of Section 1752's definitional subsection to require proof the defendant engaged in the proscribed conduct knowing the reason the area was restricted due to the presence of a USSS-protectee. *See* Verdict Tr. at 4, *United States v. Samsel*, No. 21-cr-537 (JMC) (D.D.C. Feb. 2, 2024) (Cobb, J.); *United States v. Groseclose*, No. 21-cr-311 (CRC), 2024 WL 68248, at *9 (D.D.C. Jan. 5, 2024) (Cooper, J.); *United States, v. Elizalde*, No. 23-cr-170 (CJN), 2023 WL 8354932, at *7 (D.D.C. Dec. 1, 2023) (Nichols, J.); *United States v. Hostetter*, No. 21-cr-392 (RCL), 2023 WL 4539842, at *4 (D.D.C. July 13, 2023) (Lamberth, J.).

As explained below, the USSS-protectee requirement serves a critical jurisdictional only purpose authorizing federal enforcement of the statute and, thus, binding precedent does not require "knowingly" to extend beyond the fair notice requirement in Section 1752's definitional subsection to reach, as defendants urge, the USSS-protectee presence requirement, which is not a substantive but only a jurisdictional element.

### 1. Overview of Applicable Precedent

Ordinarily, "[w]hether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent," starting "from a longstanding presumption . . . that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (citations omitted). This "presumption in favor of scienter . . . applies with equal or greater force when Congress includes a general scienter provision in the statute itself," *id.* (citation omitted), as Congress did in Section 1752, where each paragraph describing the proscribed conduct in subsection (a) begins with the *mens rea* "knowingly." For such statutes, "a word such as 'knowingly' modifies not only the words directly following it, but also those other statutory terms that 'separate wrongful from innocent acts.'" *Ruan v. United States*, 597 U.S. 450, 458 (2022) (quoting *Rehaif*, 139 S. Ct. at 2197) (citations omitted).

This presumption, however, has no application to a statute's jurisdictional element, which "simply ensure[s] that the Federal Government has the constitutional authority to regulate the defendant's conduct" and "normally ha[s] nothing to do with the wrongfulness of [that] conduct." *Rehaif*, 139 S. Ct. at 2196 (citing *Torres v. Lynch*, 578 U.S. 452, 467 (2016)); *see Torres*, 578 U.S. at 457 ("Congress cannot punish felonies generally; it may enact only those criminal laws that are connected to one of its constitutionally enumerated powers." (quotation marks and citation

omitted)); *United States v. Feola*, 420 U.S. 671, 685 (1975) ("The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum."). This is because, while the "substantive elements primarily define the behavior that the statute calls a violation of federal law," *Torres*, 578 U.S. at 457 (cleaned up), the "jurisdictional element, by contrast, ties the substantive offense . . . to one of Congress's constitutional powers . . . thus spelling out the warrant for Congress to legislate," *id.* (citation omitted); *see also id.* at 467 ("[T]he substantive elements of a federal statute describe the evil Congress seeks to prevent; the jurisdictional element connects the law to one of Congress's enumerated powers, thus establishing legislative authority." (citations omitted)); *United States v. Yermian*, 468 U.S. 63, 68 (1984) ("Jurisdictional language need not contain the same culpability requirement as other elements of the offense."). As "courts have often recognized . . . Congress uses substantive and jurisdictional elements for different reasons and does not expect them to receive identical treatment." *Torres*, 578 U.S. at 467.

In some circumstances, "an element that makes evident Congress's regulatory power also might play a role in defining the behavior Congress thought harmful," *id.* at 471, and such dual function elements have "an element of the offense Congress intended to describe and to punish," *Feola*, 420 U.S. at 676 n.9. Thus, "[t]he question . . . is not whether the requirement is jurisdictional, but whether it is jurisdictional only." *Id.* A requirement is "jurisdictional only" if Congress did not intend for the scienter to apply to it, such that "the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *Torres*, 578 U.S. at 468 (quoting *Feola*, 420 U.S. at 676 n.9). Ultimately, whether the scienter requirement "modif[ies] the statute's jurisdictional

13

language" is a matter of congressional intent, informed by the statute's text, structure, and purpose. *Yermian*, 468 U.S. at 68.

*United States v. Feola*, 420 U.S. 671, is instructive on the methodology of statutory analysis to ascertain "jurisdictional only" elements to which no application of a *mens rea* requirement is required. In that case, the Supreme Court held that "knowledge that the intended victim" of assault "is a federal officer" was not required for the offense of conspiracy, under 18 U.S.C. § 371, to commit an assault on a federal officer, in violation of 18 U.S.C. § 111, because the federal-officer element was "jurisdictional." *Feola*, 420 U.S. at 672–73, 676, 696. The conspiracy scrutinized in *Feola* had the object to violate 18 U.S.C. § 111, which penalizes, *inter alia*, forcible assaults against "any person designated in section 1114 of this title," with this cross-referenced section providing the definition of designated protected persons as "any officer or employee of" enumerated agencies. *Id.* at 673 n.1 (quoting 18 U.S.C. § 1114). The Court looked to the text of Section 111 to find that "[a]ll the statute requires is an intent to assault, not an intent to assault a federal officer," *id*. at 684, and also to the congressional purpose, which was to provide a federal forum to "insure uniformly vigorous protection of federal personnel," *id.*, based on concerns that "state officials would not always or necessarily share congressional feelings of urgency as to the necessity of prompt and vigorous prosecutions of those who violate the safety of the federal officer," *id*. Consequently, the Court concluded that the cross-referenced definitional provision in Section 1114 was a jurisdictional element, and Section 111 could not "be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer." *Id.*

Bolstering this determination was the fact that this was not a situation "where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected." *Id.* at 685. To the contrary, the Court explained that its "analysis of the substantive offense . . . is

14

sufficient to convince us that for the purpose of individual guilt or innocence, awareness of the official identity of the assault victim is irrelevant." *Id*. at 693.  For this reason, "[t]his interpretation poses no risk of unfairness to defendants," *id*. at 685, because a defendant who "may be surprised to find that his intended victim is a federal officer in civilian apparel, [] nonetheless knows from the very outset that his planned course of conduct is wrongful," *id*., and "[i]n a case of this kind the offender takes his victim as he finds him," *id*.  In other words, "[t]he concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum." *Id*.

This last consideration in assessing whether a statutory requirement is a jurisdictional only element is focused on the "risk of unfairness" to a defendant as measured by the necessary elements for criminal culpability. *Id.*  The Supreme Court has repeatedly reaffirmed the principle articulated in *Feola*, that "the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *Torres*, 578 U.S. at 468 (quoting *Feola*, 420 U.S. at 676 n.9, and citing *Yermian*, 468 U.S. at 68–69); *see also Rehaif*, 139 S. Ct. at 2196 ("No one here claims that the word 'knowingly' modifies the statute's jurisdictional element. Jurisdictional elements do not describe the 'evil Congress seeks to prevent,' but instead simply ensure that the Federal Government has the constitutional authority to regulate the defendant's conduct[.]" (citation omitted)); *cf. United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 n.3 (1994) ("[A]ge of minority is not a 'jurisdictional fact' that enhances an offense otherwise committed with an evil intent." (citing *Feola*, 420 U.S. 671)).

*United States v. Yermian*, 468 U.S. 63, serves as another example of the analysis employed to differentiate substantive elements to which the scienter requirement applies from jurisdictional elements to which a scienter requirement does not.  The Supreme Court in *Yermian* considered the

15

federal criminal false statement statute, 18 U.S.C. § 1001, which at the time imposed criminal penalties on persons who, "within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false, fictitious or fraudulent statements or representations." *Yermian*, 468 U.S. at 68 (quoting 18 U.S.C. § 1001). Examining the "plain language and the legislative history," *id.* at 75, the Court held that the government need not prove the defendant made false statements "with actual knowledge of federal agency jurisdiction," since "[t]he statutory language requiring that knowingly false statements be made 'in any matter within the jurisdiction of any department or agency of the United States' [was] a jurisdictional requirement," *id.* at 68 (quoting 18 U.S.C. § 1001). "[Turning] first to the language of the statute," the Court found that the "jurisdictional language appears in a phrase separate from the prohibited conduct modified by the terms 'knowingly and willfully,'" so that "[a]ny natural reading of § 1001 . . . establishes that the terms 'knowingly and willfully' modify only the making of 'false, fictitious or fraudulent statements,' and not the predicate circumstance that those statements be made in a matter within the jurisdiction of a federal agency." *Id.* at 68–69 (quoting § 1001). The Court then concluded that legislative history lent "no support . . . for [the] argument that the terms 'knowingly and willfully' modify the phrase 'in any matter within the jurisdiction of [a federal agency],'" *id.* at 73 (second brackets in original), since the "jurisdictional language was added . . . solely to limit the reach of the false-statements statute to matters of federal interest," *id*. at 74.

Courts of appeals employing the methodology used in *Feola* and *Yermian* have likewise held that statutory elements, similar to the USSS-protectee requirement at issue here, are jurisdictional only. For example, courts have repeatedly held that 18 U.S.C. § 641, which imposes criminal penalties on a person who "embezzles, steals, purloins, or knowingly converts to his use or the use of another . . . [any] thing of value of the United States," does not require knowledge

"that the stolen property belong[ed] to the government," *United States v. Baker*, 693 F.2d 183, 186 (D.C. Cir. 1982), because this requirement "merely furnishes the basis for federal jurisdiction and [] defendant's knowledge of this jurisdictional fact is irrelevant," *id.* (citations omitted); *see also United States v. Hicks*, 15 F.4th 814, 817 (7th Cir. 2021) (collecting decisions by nine circuit courts). The statute's structure and legislative history demonstrated "that Congress intended the section to codify the common law crimes of larceny and embezzlement," *United States v. Howey*, 427 F.2d 1017, 1018 (9th Cir. 1970), and the fact of federal property ownership "was not an essential part of the common law larceny-type offense" since "it was enough that [defendant] knew it did not belong to him" for the act to be wrongful, *United States v. Crutchley*, 502 F.2d 1195, 1201 (3d Cir. 1974) (citation omitted); *see also United States v. Jeffery*, 631 F.3d 669, 675, 677 (4th Cir. 2011) (holding that government-ownership requirement in statute criminalizing embezzlement of public funds, 18 U.S.C. § 641, "is a jurisdictional fact only" where "Section 641's requirement of government ownership . . . does not separate legal innocence from wrongful conduct, for the simple reason that stealing is wrongful conduct whether or not the stolen property belonged to the government."); *Howey*, 427 F.2d at 1018 ("The legislative history provides no support for an assumption that Congress intended in [S]ection 641 to add to the common law offenses a new requirement that a thief know who owned the property he was stealing.").

Likewise, in considering the criminal statute penalizing "willfully injur[ing] or commit[ting] any depredation against any property of the United States," under 18 U.S.C. § 1361, courts have found this statute does not "demand[] that a defendant know the damaged property belongs to the United States," *United States v. Krause*, 914 F.3d 1122, 1127 (8th Cir. 2019) ("[K]nowledge of government ownership is not supported by the statute's plain language."); *see also United States v. LaPorta*, 46 F.3d 152, 158 (2d Cir. 1994) (same). So too, in considering the

criminal proscription in 18 U.S.C. § 922(a)(6), which makes unlawful "for any person in connection with the acquisition . . . of any firearm or ammunition from a . . . licensed dealer . . . knowingly to make any false or fictitious oral or written statement . . . intended . . . to deceive such . . . dealer," two *mens rea* requirements of "knowingly" and "inten[t]" are placed before the term "dealer," who is the target of the deceit, but courts have rejected the defense argument that "knowingly" applies to the dealer's status, concluding that this statute "does not require the prosecution to prove that the accused acquired the firearm from a dealer whom he knew to be licensed." *United States v. Green*, 544 F.2d 746, 747–48 (4th Cir. 1976) (per curiam) (holding that "knowledge that the dealer has a federal license is not an essential element of the crime. The fact that the dealer was licensed serves only to establish a basis for federal jurisdiction."); *accord United States v. Prince*, 647 F.3d 1257, 1267 (10th Cir. 2011) ("§ 924(a)(1)(A)'s records requirement is simply a jurisdictional hook. It provides authority for the United States to criminalize false statements made to firearms dealers.").

In a final example, the Fourth Circuit recently considered a federal arson statute, making unlawful "willfully and without authority, set[ting] on fire any timber, underbrush, or grass or other inflammable material . . . upon any lands owned or leased by . . . the United States." *United States v. Evans*, 74 F.4th 597, 601 (4th Cir. 2023) (quoting 18 U.S.C. § 1855). Upon concluding that the federal-ownership requirement "is a jurisdictional element, so we presume that the statute's general *mens rea* requirement does not extend to it," *id.* at 605, the court determined, "[t]herefore, the Government did not have to prove that [defendant] knew he was on federal land or intended to burn federal land," *id.* at 602; *id.* at 603 ("We agree with the district court that Section 1855's federal-ownership requirement is a jurisdictional element to which no *mens rea* attaches."). In reaching this conclusion, the court followed the guideposts for analysis in *Feola*

and *Yermian*, starting with finding that "[n]othing in the statutory text indicates that a defendant must have specifically intended to burn government land," *id*. at 604 (citations omitted), before turning to the irrelevance of the federal-ownership element to demonstrate a culpable state of mind and the statutory purpose. As to these latter two considerations, the court found that "the federal-ownership requirement is not an element that separate[s] wrongful conduct from innocent acts," since "whether the defendant acted 'willfully and without authority' to burn the property of another—not whether the federal government owns the burned property—is what separates innocent from criminal conduct under the statute." *Id.* at 605 (citing *Ruan*, 597 U.S. at 459, and 18 U.S.C. § 1855). Finally, the court looked to the statutory purpose, which "bolsters our conclusion that the federal-ownership requirement contains no *mens rea* component," because "Congress enacted Section 1855 . . . to protect federal land and property by making arson a federal crime," but requiring "the Government to prove the defendant knew he was on federal land would weaken that protection," which the court declined to do "when the statutory text does not compel it, the prohibited conduct is otherwise culpable, and jurisdictional elements are assumed to stand outside the otherwise applicable *mens rea* element." *Id.* at 606 (citing *Torres*, 578 U.S. at 468).

Set against these examples of federal criminal statutes concerning assault, false statements generally, false statements to licensed firearms dealers, theft, property damage, and arson, for which courts have identified jurisdictional only elements to which the *mens rea* requirement does not attach, the same result is compelled by applying the same analysis to Section 1752.

### 2. *Identifying Jurisdictional Only Element in Section 1752's Prohibitions*

Employing the same analysis applied in *Feola* and *Yermian* to 18 U.S.C. §§ 111 and 1001, respectively, the question whether Congress intended the *mens rea* "knowingly" in Section 1752(a)(1) and (a)(2) to extend, via subsection (c)(1) and its subparts, to the USSS-protectee

19

requirement, starts with the text and structure of this statute. This analysis demonstrates that applying "knowingly" to the USSS-protectee requirement is not compelled by the statute's definitional provision that is wholly "separate from the prohibited conduct modified" by "knowingly," *Yermian*, 468 U.S. at 69, as confirmed by consideration of the statutory purpose and the fact that the USSS-protectee requirement does not "separate wrongful from innocent acts," Gov't's Opp'n MIL at 25; Gov't's Resp. at 17. Instead, the qualifiers contained in sub-parts of the definitional subsection for "restricted buildings or grounds," serve as the basis for the federal interest and enforcement authority.

Beginning with Section 1752's text and structure, "assuming that the ordinary meaning of that language accurately expresses the legislative purpose," *Fischer*, 64 F.4th at 335 (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)), the *mens rea* requirement of "knowingly" is in the same sentence as other key operative words of paragraphs (1) and (2) of subsection (a). Recall that Section 1752 prohibits conduct of "knowingly" "enter[ing] or remain[ing]" "without lawful authority to do so" when that conduct occurs "in any restricted building or grounds," 18 U.S.C. § 1752(a)(1), and "knowingly" "engag[ing] in disorderly or disruptive conduct" "when or so that such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions," and when that conduct occurs "in . . . any restricted building or grounds[,]" *id.* § 1752(a)(2). As the D.C. Circuit has indicated, "the word 'knowingly' in a criminal statute would typically apply to all offense elements that follow it," *United States v. Morgan*, 45 F.4th 192, 206 (D.C. Cir.), *cert. denied*, 143 S. Ct. 510 (2022), and the parties agree that "knowingly" modifies the operative elements of (a)(1), *i.e.*, "enters or remains," "restricted building or grounds," and "without lawful authority to do so," and of (a)(2), *i.e.*, "engages in disorderly or disruptive conduct" and "restricted building or grounds," Defs.' MIL at 2–5; Gov't's

Resp. at 4. Notably, in multiple examples discussed above involving false statements, firearms transaction, and arson criminal statutes, the *mens rea* requirement for the proscribed conduct preceded *in the same sentence* the key term found to be the jurisdictional only element. Thus, merely because "knowingly" precedes in the same sentence the term "restricted building or grounds" in the text of paragraphs (1) and (2) of Section 1752(a), does not foreclose the conclusion that part of the definition providing the reason for the restricted area is jurisdictional only.

The definition of "restricted buildings or grounds" in subsection (c) of Section 1752 has two parts, the first of which says this phrase "means any posted, cordoned off, or otherwise restricted area." 18 U.S.C. § 1752(c)(1). The ordinary meaning of "restricted" with respect to an "area" or "building" means that an area is "accessible only to certain authorized people," *Restricted (adj.)*, OXFORD ENGLISH DICTIONARY, https://perma.cc/RTF2-99E7 (last visited Feb. 14, 2024); *see also Restricted (adj.)*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/EQJ7-GQZQ (last visited Feb. 14, 2024) (meaning "available to the use of particular groups or specifically excluding others"); *McIntyre v. Nissan N. Am., Inc.*, 962 F.3d 833, 837 (5th Cir. 2020) ("'Restricted' means 'available to the use of particular groups or [specifically] excluding others.'" (quoting *Restricted*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) (brackets in original)). Implicit in this ordinary meaning is that, by some mechanism, the area is accessible only to authorized persons, though those mechanisms may take various forms. *See e.g.*, *McIntyre*, 962 F.3d at 838 (citing various access restrictions as basis for holding the "public's access to Lot 1B was 'restricted or limited'" within meaning of Mississippi statute where "a security camera was directed at Entry 1A and was monitored from a central security office," "officers continuously patrolled the entire plant, including Lot 1B," and "the barbed-wire-topped, chain-link fence surround[ed] the entire plant").

21

This Section 1752(c)(1) definition comports with the ordinary meaning of the adjective "restricted" while making explicit some mechanisms for providing fair notice of a restricted area, without being overly prescriptive. *See United States v. Bursey*, 416 F.3d 301, 307 (4th Cir. 2005) (rejecting defendant's complaint that "there was no physical manifestation of the restricted area's boundaries," for purposes of Section 1752, when "boundaries of this restricted area were visibly marked . . . [by] law enforcement agents [] stationed at the perimeters of the area." (quotation marks and citation omitted)). Under the natural reading of the statute, therefore, "restricted building or grounds," together with the other operative elements of (a)(1) and (a)(2), is enough to make up the *actus reus* of the offense and to "separate wrongful from innocent acts," putting defendant on "notice of the facts rendering his intended conduct criminal." *Morgan*, 45 F.4th at 208 (quoting *Rehaif*, 139 S. Ct. at 2197).

Of course, the definition of "restricted buildings or grounds" continues after the descriptor "any posted, cordoned off, or otherwise restricted area," to provide further qualifiers in separate sub-parts to the subsection, including, as relevant here, the USSS-protectee requirement that the area is also "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." *Id.* § 1752(c)(1)(B). Congress's placement of the USSS-protectee requirement two-steps removed from the operative language of the proscribed offense reinforces that "knowingly" does not reach beyond the ordinary meaning of "restricted building or grounds," as encompassed by the definition in (c)(1) requiring notice, in some form, of the restricted area. Put another way, this statutory structure distances rather than closely ties the USSS-protectee requirement in (c)(1)(B) of Section 1752 to the proscribed offenses in (a)(1) and (2), and signals a congressional intent that the *mens rea* requirement is inapplicable to this subpart requirement, which instead "ties the substantive offense . . . to one of Congress's

22

constitutional powers . . . thus spelling out the warrant for Congress to legislate," *Torres*, 578 U.S. at 457 (citation omitted); *see also United States v. Price*, 980 F.3d 1211, 1219 (9th Cir. 2019) ("The phrase 'in or affecting interstate or foreign commerce' describes the nature or extent of [the] actions but, grammatically, does not tie to 'knowingly.'" (citation omitted)).[6] That subsection (c)(1)'s alternative qualifiers for "restricted buildings or grounds" likewise "tie[] the substantive offense . . . to one of Congress's constitutional powers," *Torres*, 578 U.S. at 457, reinforces this conclusion. Specifically, one alternative qualifier refers to the official residences and grounds of the President and Vice President, *see* 18 U.S.C. §1752(c)(1)(A) ("… of the White House or its grounds, or the Vice President's official residence or its grounds"), which, at a minimum, falls under Congress's power to "make all needful rules and regulations respecting . . . property belonging to the United States," U.S. CONST. art. IV, § 3, cl. 2. The last alternative qualifier refers to designated events of national significance, *see id.* § 1752(c)(1)(C) (" . . . of a building or grounds so restricted in conjunction with an event designated as a special event of national significance"), which also may "fall within one or more of Congress's enumerated powers," Cong. Rsch. Serv., RL33332, *USA PATRIOT Improvement and Reauthorization Act of 2005: A Legal Analysis* 51 (2006) ("2006 CRS Report").[7]

---

[6] The government has not made explicit the basis for Congress's authority to regulate the offenses proscribed in Section 1752. "Congress's power to legislate may [] stem from more than one enumerated power." *Park*, 938 F.3d at 363 (citing *United States v. Morrison*, 529 U.S. 598, 607 (2000) (other citations omitted)). While this basis need not be identified precisely here, as applied to defendants' offense conduct at the U.S. Capitol on January 6, 2021, this Court "discern[s] a basis for Congress's exercise" of its power to create the trespassing offense, *id.*, relating to "restricted areas" "where the President or other person protected by the Secret Service is or will be temporarily visiting," 18 U.S.C. § 1752(c)(1)(B), in Congress's power to make "all laws which shall be necessary and proper for carrying into execution . . . powers vested by this Constitution in the Government of the United States," U.S. CONST. art. I, § 8, cl. 18, and "to make all needful rules and regulations respecting . . . property belonging to the United States," *id*. art. IV, § 3, cl. 2.

[7] The 2006 CRS Report considered the federal nexus for the statutory precursor to Section 1752(c)(1)(C), proscribing trespassing "relating to 'restricted areas' temporarily cordoned off or established for a 'special event of national significance,'" concluding that this provision "may fall within one or more of Congress's enumerated powers," including Congress's "power to enact laws for the District of Columbia," *see* U.S. CONST. art. I, § 8, cl. 17, and to regulate commerce, *see* U.S. CONST. art. I, § 8, cl. 3, in the case of "special events held in the

This reading is consistent with precedent construing *mens rea* requirements in criminal statutes based on their natural meaning and the statute's structure. Indeed, where, as with Section 1752, a definition of the jurisdictional element is provided in a statutory section or subsection that is separated from the description of proscribed conduct containing the *mens rea* requirement, this statutory structure has been considered a signal that the definition qualifies as a jurisdictional only element. For example, in statutes penalizing false statements in connection with firearms transactions with licensed dealers and other licensees, as in 18 U.S.C. §§ 922(a)(6) and 924(a)(3), the definition for the jurisdictional only element of "licensed dealer" used in both statutes appears in a separate statutory section, 18 U.S.C. § 921(a)(11). *See also United States v. Escalera*, 957 F.3d 122, 132–33 (2d Cir. 2020) (statute proscribing knowing retaliation for "the attendance of a witness or party at an official proceeding," 18 U.S.C. § 1513(b)(1), "does not extend [the] knowledge requirement to the definition of 'official proceeding' provided in a separate section of Title 18," where "[i]t is not as if Congress deemed retaliatory assaults on witnesses in state proceedings to be innocent conduct which would be worthy of prohibition only if a federal proceeding were involved" (citation omitted)).

Another example where the statutory structure provides indication of a jurisdictional only element is the statute at issue in *Feola*, 18 U.S.C. § 111, which parallels the structure of Section 1752 and sets forth the conduct constituting the *actus reus* of the offense in a single sentence, criminalizing whoever "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title . . . ." 18 U.S.C. § 111(a)(1); *Feola*, 420 U.S. at 673 n.1. The cross-referenced definitional Section 1114 contains the federal-forum element

---

District of Columbia" and "events which have an impact on interstate or foreign commerce" (quoting 18 U.S.C. § 1752(a)(2) (2006)).

24

enumerating the designated protected persons. *Feola*, 420 U.S. at 673 n.1. Considering the text of Section 111, the Court concluded that the *mens rea* extended only to the "acts [] specified" in Section 111 and not to the federal-officer requirement contained in the cross-referenced section, with the result that "[a]ll the statute requires is an intent to assault, not an intent to assault a federal officer." *Id.* at 684, 686. Like Section 111 addressed in *Feola*, where, as here, elements constituting the *actus reus* reside in a section separate from the cross-referenced definitional section containing the jurisdictional element, the *mens rea* of "knowingly" in Section 1752 modifies the operative elements of the offense in (a)(1) and (a)(2), including the ordinary meaning of "restricted buildings or grounds," as codified in (c)(1)'s notice requirement, but does not reach so far into the sub-parts of this definitional subsection to modify the USSS-protectee requirement.

To be sure, unlike in *Feola* where Section 111's jurisdictional element comprised the entirety of the cross-referenced definitional Section 1114, this conclusion requires, as *Groseclose* recognized, "pick[ing] apart the statutory definition [of 'restricted building or grounds'] by reading 'knowingly' to apply to the opening clause of Subsection (c)(1), but no farther." *Groseclose*, 2024 WL 68248, at *3 (citation omitted). As the Supreme Court has acknowledged, "some tough questions may lurk on the margins—where an element that makes evident Congress's regulatory power also might play a role in defining the behavior Congress thought harmful." *Torres*, 578 U.S. at 470–71. "Rather than expecting (let alone demanding) perfection in drafting," however, when "Congress could have expressed itself more clearly" in distinguishing between jurisdictional and substantive elements, *id*. at 472, the Supreme Court has instructed courts to focus on the question: "Is that the right and fair reading of the statute before us?" *Id*. at 473. The inelegant slicing of Section 1752's definitional subsection for *mens rea* purposes does not override the same focus here, as the above discussion of Section 1752's text and structure demonstrates, and as

25

confirmed by the statute's purpose and history, discussed next, which bolster the conclusion that the USSS-protectee requirement in (c)(1)(B) simply sets forth the federal nexus of the offense.

The Senate Report issued at the time of Section 1752's original enactment states that this statute was "designed to provide a uniform minimum of Federal jurisdiction for Presidential security when the President is on temporary visits," S. Rep. No. 91-1252, at 6 (1970), when the USSS otherwise had to "rely upon the assistance of local authorities to arrest persons who may be guilty of such disruptive conduct," *id.* at 7. Like Section 111 at issue in *Feola*, *see* 420 U.S. at 684, "almost everything proscribed in subsection (a) [was] [] outlawed in some form or other at the State or local level," and Section 1752 simply "ma[de] these activities a Federal offense so that the Secret Service ha[d] the authority to prevent such activities," *id.*

This articulated purpose makes clear that the enacting Congress "was motivated by a desire to federalize ordinary state-law offenses in order to achieve more certainty and uniformity over security measures involving important federal officers." *Groseclose*, 2024 WL 68248, at *7. Nevertheless, *Groseclose* concluded that while the enacting Congress may have intended the "extra layer of knowledge" of the USSS-protectee requirement to be "jurisdictional only," the subsequent amendment to the statute in 2006 "created a different sort of federal crime" when it "doubled the maximum penalty from six months to one year," *id.* at *8, in order to "make the penalty consistent with the prescribed penalty under 18 U.S.C. § 3056(d) (interference with Secret Service law enforcement personnel generally)," *id.* (quoting H.R. Rep. No. 109-333, at 110 (2005) (Conf. Rep.)). In so doing, according to *Groseclose*, the enacting Congress created "an *aggravated* offense leveling an added penalty against those who endanger Secret Service protectees," *id.* (emphasis in original). The "extra layer of knowledge" of "the Secret Service protectee's presence

26

. . . is what sets § 1752 violators apart and makes them worthy of the aggravated prohibition," *id.*, stripping the USSS-protectee element of its status as "jurisdictional only," *id.*

*Groseclose*'s reliance on statutory penalties to assess whether a statutory term is an element to which the *mens rea* requirement applies, or not, is simply not the measure of congressional intent as to this issue—nor is the U.S. Sentencing Commission's recommended sentencing range in response to a statutory change. *See id.* at \*6, 8. While a statute's penalty structure may reflect the importance ascribed by Congress to the purpose of the statute, this is not a signal as to what serves as a jurisdictional only element within the statutory text. The jurisdictional element "ensure[s] that the Federal Government has the constitutional authority to regulate the defendant's conduct," *Rehaif*, 139 S. Ct. at 2196 (citing *Torres*, 578 U.S. at 467), and the penalties reflect the seriousness of the violation, an entirely different matter. Indeed, *Feola* and *Yermian* did not consider the statutory penalty structure when determining that Section 111's federal-officer element and Section 1001's agency-jurisdiction element were jurisdictional. To the contrary, *Feola*'s holding was critiqued in dissent because an assault on a federal officer at the time carried a "harsher penalty than . . . for an unarmed assault on a private citizen" under state law. *Feola*, 420 U.S. at 702–03 (Stewart, J., dissenting); *see also Yermian*, 468 U.S. at 75 ("In the unlikely event that § 1001 could be the basis for imposing an unduly harsh result on those who intentionally make false statements to the Federal Government, it is for Congress and not this Court to amend the criminal statute."). *Groseclose* reasoned that Congress's 2006 amendment to Section 1752 "doubl[ing] the maximum penalty from six months to one year" put to bed any argument that the USSS-protectee requirement is "jurisdictional only," since "[t]o warrant the enhanced penalty, the culprit must know that . . . he is endangering the Secret Service and their protectees." 2024 WL 68248, at \*8. This reasoning, however, is hard to reconcile with the statute's purpose, which

27

Congress deemed sufficiently important to increase the penalty for the prohibited conduct. For Congress to have increased the penalty and simultaneously attached a *mens rea* requirement to an otherwise jurisdictional only element would have the result of making enforcement *more* difficult, given the additional elements to which a *mens rea* would apply. Requiring the government to prove the defendant knew the precise reason for the restriction placed on a "restricted building or ground," would, as the Fourth Circuit stated in a different context, "weaken that protection." *Evans*, 74 F.4th at 606.

If anything, the statute's history supports the conclusion that "knowingly" was not intended to modify the USSS-protectee requirement. In 2012, Congress amended the statute by introducing the defined term "restricted building or grounds," setting forth its bifurcated definition deep within the separate subsection (c)(1), as the statute appears today. *See* Federal Restricted Buildings and Grounds Improvement Act of 2011, Pub. L. No. 112-98, § 2, 126 Stat. 263, 263–64 (2012). Prior to this reorganization, components of the fair notice and USSS-protectee requirements resided in the same subsection, both preceded by the *mens rea* "willfully and knowingly." *See* U.S.C. § 1752(a)(1) (effective Mar. 9, 2006 to Mar. 7, 2012) ("It shall be unlawful for any person or group of persons . . . (1) willfully and knowingly to enter or remain in any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."). In so amending, Congress did not carry over the *mens rea* requirement from the substantive provision containing the offense conduct to the definitional subsection, (c)(1), notwithstanding its intent to "correct and simplify the drafting of [S]ection 1752," H.R. Rep. No. 112-9, at 1 (2011), offering no indication that it "meant to require" a defendant to know "why an area is posted, cordoned off, or otherwise restricted," Gov't's Opp'n MIL at 19.

28

Requiring proof of such knowledge of the reason for the restricted area would run counter to Congress's purpose in enacting "a statute designed to safeguard the President and other Secret Service protectees," *United States v. Griffin*, 549 F. Supp. 3d 49, 57 (D.D.C. 2021). "[T]he very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive Branch." Responses to Jury Questions at 4, *Rhine*, No. 21-cr-687 (citation omitted). It would make little sense, therefore, "that a provision that is looking to protect Secret Service protectees would require the Secret Service to somehow be telling people . . . which protectee was in the restricted area." Trial Tr. at 332:11–15, *Griffin*, No. 21-cr-92. Defendants' preferred interpretation would lead to the illogical result that a statute designed to enhance the protection of those holding "highest office," S. Rep. No. 91-1252, at 5, would instead undermine their very security, by making them even greater "object[s] of [] public notice," *id.* at 6–7. Congress could not have intended this absurd outcome. *See Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 411 (D.C. Cir. 2013) ("a statute should not be construed to produce an absurd result" (quotation marks and citation omitted)); *accord Escalera,* 957 F.3d at 134 ("To require the Government to establish the defendant's awareness of the federal nature of the proceeding in which the witness testified, when the federal nature of the proceeding was irrelevant to the retaliatory motivation, would often preclude effective prosecutions of witness retaliation [under 18 U.S.C. § 1513(b)(1)]. We can surmise no reason why Congress would wish to do so, and do not impute to Congress a limitation that the statutory text does not require." (citations omitted)).

In this vein, the government cautions that the practical implications of imposing a *mens rea* requirement on parts of the definitional subsection to the proscribed conduct in Section 1752 would "significantly curtail the future enforcement of the statute." Gov't's Notice Add. Auth. at

29

3.[8]  While "[i]t is one thing to prove an individual's knowledge of the President's whereabouts," proof of knowledge of other USSS-protectees' presence "would [] be difficult" unless a USSS-protectee's visit were publicized, which publication would, as already noted, undermine the security of the protectee, since "a dignitary's protectee status is not often known . . . and Secret Service agents are [] not readily identifiable to the public." Gov't's Resp. at 14 n.2.  As the government explains, even in circumstances involving recognizable protectees, "proving not just that a defendant trespassed and that the defendant knew an area was blocked off, but also that [they] knew why the area was restricted," *id.*, could leave the statute "unworkable in a wide range of settings involving [USSS] protectees," and in turn, "effectively force the government to revert to a patchwork of state-law violations—precisely the situation that Section 1752 was intended to rectify," Gov't's Notice Add. Auth. at 3.

Finally, in accord with the methodology applied in *Feola* and *Yermian*, the conclusion that the USSS-protectee requirement is jurisdictional is bolstered by the fact that "[t]his interpretation poses no risk of unfairness to defendants," *Feola*, 420 U.S. at 685, since the USSS-protectee requirement is not an "element separating legal innocence from wrongful conduct," *Ruan*, 597 U.S. at 461 (quoting *X-Citement Video, Inc.*, 513 U.S. at 72–73).  As in *Feola*, this "situation is not one where legitimate conduct becomes unlawful solely because of" the presence of USSS protectees, *Feola*, 420 U.S. at 685, since "[a] defendant who enters an area he knows to be restricted, while knowing that he lacks authority to be there, has engaged in wrongful conduct regardless of whether he knows the area is restricted" due to a USSS protectee's presence, Gov't's Opp'n MIL at 18; *accord Morgan*, 45 F.4th at 207–08 (statute criminalizing the transport of minors

---

8       The government also highlights that adoption of defendants' construction of Section 1752 may undermine the more than 1,200 prosecutions to-date for violations of Section 1752 on January 6, 2021, *see* Gov't's Notice Add. Auth. at 3, but that concern, standing alone, is insufficient to bar an otherwise correct interpretation of a criminal statute.

with intent that the minor engage in sexual activity does not require knowledge of victim's age, where "applying the word 'knowingly' to the under-18 element in section 2423(a) would not separate wrongful from otherwise innocent conduct" (emphasis omitted)); *United States v. Flores-Garcia*, 198 F.3d 1119, 1122–23 (9th Cir. 2000) (holding 8 U.S.C. § 1327 does not require knowledge of "an alien's prior felony conviction" since that is not a "circumstance that would make criminal 'otherwise innocent conduct'" (quoting *X-Citement Video, Inc.*, 513 U.S. at 72)).

In sum, the text, structure, history, and purpose of Section 1752 make clear that Congress intended the USSS-protectee requirement to set forth the prerequisite for the exercise of federal jurisdiction, not to "describe the evil Congress seeks to prevent." *Torres*, 578 U.S. at 467 (citations omitted). Under Section 1752, the USSS-protectee requirement in a part of the definitional subsection has no bearing on the "wrongfulness [or] innocence" of the conduct, and proof of knowledge of the USSS-protectee requirement is accordingly not required. *Ruan*, 597 U.S. at 458.

## B. The Capitol Building and Grounds Were "Restricted Areas"

Defendants next contend that they may not be charged with entering a "restricted building or grounds," as defined in 18 U.S.C. §1752(c)(1)(B), because, first, the USSS must designate such a location, Defs.' MTD at 11–14, and second, that "evidence of restriction" must be "something that physically and objectively defines a perimeter or its boundaries as restricted," Defs.' MIL at 2. These defense arguments fail.

### 1. Restricted by the U.S. Secret Service

Defendants first assert that for an area to be a "restricted building or grounds," under Section 1752, the area must be "restricted by the USSS," and since the USSS did not designate the area as restricted, the Capitol on January 6, 2021, did not qualify as a "restricted building or grounds." Defs.' MTD at 11–14. Defendants base their argument on the fact that Section 1752, as-enacted, authorized the "Treasury Department, of which the USSS was then part," to

"'prescribe[] regulations' governing the 'posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting,'" *id.* at 3 (citing Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, § 18, 84 Stat. 1891 (1971)).

Although conceding that the statutory language on which they ground their argument was removed from the statute in 2006, *see id.* at 4, defendants nonetheless argue that "all three definitions of 'restricted building or grounds' in § 1752(c)(1) concern the authority and actions of the USSS and not any other federal agency," *id.* at 11. Yet, as Judges on this Court have unanimously held, including the undersigned, *see United States v. Oliveras*, No. 21-cr-738 (BAH), 2023 WL 196746, at *1 (D.D.C. Jan. 17, 2023), the plain meaning of the current text of Section 1752 contains no requirement that anyone, including the USSS, formally designate the area as "restricted," and defendants' "attempt to read such a requirement as implied in the statutory language goes against the common sense reading of the text and its legislative history," Gov't's Opp'n Defs.' Mot. Dismiss Counts Two and Three ("Gov't's Opp'n MTD") at 4–5, ECF No. 62; *see, e.g.*, *United States v. Andries*, No. 21-cr-93 (RC), 2022 WL 768684, at *14 (D.D.C. Mar. 14, 2022) ("Absent from the text is any mention of a requirement that any specific entity must restrict or cordon off the area, let alone a requirement that only the Secret Service may be the restricting entity." (collecting cases)).[9]

---

[9]     *See also United States v. Grider*, 617 F. Supp. 3d 42, 53 (D.D.C. 2022) ("[N]othing in the statutory text requires 'the Secret Service to be the entity to restrict or cordon off a particular area,' nor does [defendant] point to any provision in the statute in support of such a proposition." (citation omitted)); *United States v. Bingert*, 605 F. Supp. 3d 111, 131 (D.D.C. 2022) (Lamberth, J.) (similar); *Griffin*, 549 F. Supp. 3d at 55 (McFadden, J.) ("[T]he only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting."); *United States v. Mostofsky*, 579 F. Supp. 3d 9, 28 (D.D.C. 2021) ("The text plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area. While [defendant] talks about the original 1970 statute being geared toward the Secret Service . . . its current language now has no such reference."); Omnibus Order at 3–4, *United States v. Caldwell*, No. 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (Mehta, J.) (similar).

The statutory history "affirms the plain reading of the text that Defendant[s] resist[]." Gov't's Opp'n MTD at 7 (citing *Andries*, 2022 WL 768684, at *14). When Congress passed the USA PATRIOT Improvement and Reauthorization Act of 2005 ("Reauthorization Act"), Pub. L. No. 109-177, 120 Stat. 192 (2006), Congress removed the authority (and responsibility) of the Secretary of the Treasury, the USSS, or anyone else to "designate" the "buildings and grounds which constitute the temporary residences of the President or other person protected by the Secret Service," 18 U.S.C. § 1752(d)(1) (2004), and instead defined the locations covered by § 1752 as "any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," Reauthorization Act § 602(a)(1)(A), 120 Stat. at 252. As discussed, *supra* Part III.A.2, the statute was further reorganized in 2012 to proscribe certain conduct simply in "any restricted building or grounds" and then separately defining "restricted buildings or grounds" as including, *inter alia*, "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." Pub. L. No. 112-98, § 2, 126 Stat. at 263–64. That language remains in force.

The USSS remains relevant to the definition of "restricted buildings or grounds," given that the Vice President is not expressly named in the statute and is included by his indisputable status as a "person protected by the Secret Service." 18 U.S.C. § 1752(c)(2) (defining such a person as "any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection"); *id.* at § 3056(a)(1) (authorizing USSS protection of the Vice President). Nevertheless, nothing about this text or any other authority supports defendants' leap to the conclusion that the agency triggering the statutory qualifier for a restricted area, *i.e.*, the USSS and

its protectees, must be the same agency imposing and guarding the restrictions. *See* Defs.' MTD at 2. If anything, the statutory history demonstrates a movement away from a formal "designation" process to one that operates automatically by virtue of the presence of a Secret Service protectee.[10]

### 2. Visible or Physical Restrictions

Defendants next contend that the term "otherwise restricted," as used in the definition of "restricted buildings or grounds," *see* 18 U.S.C. § 1752(c)(1) ("the term 'restricted buildings or grounds' means any posted, cordoned off, or otherwise restricted area . . . ."), requires "visible or physical restrictions that objectively delineate . . . a defined perimeter as restricted," since the term "otherwise restricted . . . means restricted in a similar manner to the preceding restrictions," Defs.' MIL at 1 (citations omitted). Defendants' narrow interpretation is simply unpersuasive.

"When interpreting a statute, we begin by analyzing the statutory language, assuming that the ordinary meaning of that language accurately expresses the legislative purpose." *Fischer*, 64 F.4th at 335 (quotation marks omitted) (quoting *Hardt*, 560 U.S. at 251). As discussed *supra*, Part III.A.2, the ordinary meaning of "restricted" with respect to an "area" or "building" means "accessible only to certain authorized people." *Restricted (adj.)*, OXFORD ENGLISH DICTIONARY, https://perma.cc/RTF2-99E7 (last visited Feb. 14, 2024). The term "otherwise" means "in another way" or "or in other ways," *Fischer*, 64 F.4th at 336 (quotation marks omitted) (quoting dictionary

---

[10]     Defendants cite as support for their position *United States v. Bursey*, 416 F.3d 301, and *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020), *see* Defs.' MTD at 12–13, but neither case is helpful since neither addressed whether the USSS must be the designator of an area as "restricted" for the area to qualify as a "restricted building or grounds" under Section 1752. In *Bursey*, the Fourth Circuit affirmed the trial court's conclusion that the defendant "willfully and knowingly . . . enter[ed] or remain[ed] in any posted, cordoned off, or otherwise restricted area" where "person[s] protected by the Secret Service is or will be temporarily visiting," *Bursey*, 416 F.3d at 309 (quoting version of 18 U.S.C. § 1752(a)(1)(ii) then in-effect), noting the district court's finding that defendant "understood the restriction to have been created by the Secret Service" and the "ample evidence that [defendant] understood the area to have been" so restricted, *id.*, and thus the court had no occasion to analyze the issue and "[t]here [was] no holding—binding or persuasive—on this question," *Griffin*, 549 F. Supp. 3d at 56. Defendants also make much of the fact that, in *Wilson*, the "Secret Service established a restricted area . . . and limited access to that area to authorized persons," Defs.' MTD at 13 (quoting *Wilson*, 417 F. Supp. 3d at 95–96), but, again, the court did not address, let alone hold, that Section 1752(a)(1) requires the Secret Service to be the designator of an area as restricted.

definitions of the term "otherwise"). A plain reading of the phrase "restricted buildings or grounds" therefore encompasses "any area of a building or grounds that is posted, cordoned off, or in *another way* made accessible only to *certain authorized people*." Gov't's Opp'n MIL at 8 (emphasis supplied); *see also Bursey*, 416 F.3d at 307 (area "restricted" within the meaning of Section 1752 where "law enforcement agents were stationed at the perimeters of the area," which was "sufficient to make it a 'cordoned off' and otherwise restricted area"). Under this straightforward construction, a "visible or physical restriction," Defs.' MIL at 2, would not be required to restrict an area within the meaning of Section 1752, *see United States v. Ballenger*, No. 21-cr-719 (JEB), 2023 WL 4581846, at *3 (D.D.C. July 18, 2023) ("[Defendants] argue that this phrase implicitly refers to 'tangible, material restrictions,' and that 'police cars with flashing lights' or 'noises' do not a restricted area make. The Court declines to adopt this narrow construction of the broad phrase 'otherwise restricted.'" (citations omitted)); *United States v. Bingert*, No. 21-cr-91 (RCL), 2023 WL 3613237, at *5 (D.D.C. May 24, 2023) (concluding the government proved that "defendant entered or remained in a restricted building or grounds" where the "perimeter [of the Capitol grounds] was delineated with bike racks and snow fencing, as well as signage indicating that the area was closed and additional layers of barricades within the restricted area").

While the legislative history need not be considered "because the meaning of the statute is clear from its text," *Fischer*, 64 F.4th at 346 (citations omitted), such history and the statutory purpose confirm an interpretation broader than defendants urge. Section 1752, enacted as part of the Omnibus Crime Control Act of 1970, proscribed the "knowing and willful entry or presence in . . . [an] otherwise restricted area," S. Rep. No. 91-1252, at 2, "for the special case of a temporary Presidential visit where flexibility must be maintained" and where "there w[ould] not be adequate time" for "written public notice," *id.* at 2, 9; *see* Pub. L. No. 91-644, 84 Stat. 1880, 1891–92 (1971).

Although Congress "anticipated that the Secret Service [would] make every effort . . . to make such restricted areas known to the public," *id.* at 9, "it did not limit Section 1752's applicability to that situation or require public notice, when . . . it would be inconsistent with Presidential security," Gov't's Opp'n MIL at 9.

In subsequent amendments to the statute, Congress broadened Section 1752's protective scope, extending "the same 'zone of protection'" to "all persons protected by the United States Secret Service," H.R. Rep. No. 97-451, at 1 (1982); *see* Pub. L. No. 97-308, 96 Stat. 1451, 1451 (1982), removing the condition that a defendant violate "regulations governing ingress or egress" to a restricted area, Pub. L. No. 91-644, 84 Stat. at 1892 (1971); *see* Reauthorization Act, 120 Stat. at 252 (2006), and removing the requirement that a defendant act "willfully," Pub. L. No. 112-98, § 2, 126 Stat. at 263 (2012), making clear Congress's "intent that Section 1752 apply broadly, maximizing the Secret Service's ability to protect the President, Vice President, and others," Gov't's Opp'n MIL at 9; *see also Griffin*, 549 F. Supp. 3d at 56 ("recogniz[ing] the direction of Congress's legislative march" in Section 1752's statutory history, "where at every turn it has broadened the scope [of] the statute and the potential for liability" (emphasis omitted)).

Defendants argue that "use of the term 'otherwise restricted' . . . means restricted in a similar manner to the preceding restrictions," Defs.' MIL at 1 (citations omitted), alluding to the *noscitur a sociis* canon of construction, which "generally instructs that 'a word is known by the company it keeps,'" *Fischer*, 64 F.4th at 346 (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008)). This canon does not, however, "convince [this Court] to reject the natural reading of" Section 1752, *Fischer*, 64 F.4th at 345, namely*,* that "otherwise restricted" embraces areas "accessible only to certain authorized people," Gov't's Opp'n MIL at 11, regardless of whether the area is demarcated by "visible or physical restrictions," Defs.' MIL at 2, particularly where

36

defendants' preferred reading would lead to the absurd result that "a person could enter an area he knew to be off limits simply because the signs indicating that restriction had been removed by someone else," Gov't's Opp'n MIL at 12 (emphasis omitted); *accord Ctr. for Biological Diversity*, 722 F.3d at 411 ("[T]he absurd results doctrine [] embodies the long-standing rule that a statute should not be construed to produce an absurd result." (quotation marks and citation omitted)).

Moreover, under even defendants' proposed narrow definition of the term "otherwise restricted," the Capitol and its grounds were restricted on January 6, 2021, since, as defendants stipulated, "[t]emporary and permanent barricades . . . were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside." Defs.' SOF ¶ 4. Defendants' suggestion that the Capitol and its grounds must have been restricted by "something inherently similar to posting or cordoning off" *at the time* "Defendant[s] committed a prohibited act," Defs.' MIL at 1–2, would mean that "an appropriately restricted area may become unrestricted through the unlawful actions of individuals," Gov't's Opp'n MIL at 7—a reading of Section 1752 that "would hollow out Section 1752 altogether," *id.* at 5. This would be an absurd construction of this statute.

In any event, the facts stipulated-to by defendants, as supplemented by evidence submitted as exhibits at trial, make clear that the relevant area was "otherwise restricted" at the time defendants entered the Capitol and its grounds. Defendants "enter[ed] the restricted area on Capitol Grounds," Defs.' SOF ¶ 13, and "climbed through scaffolding on the northwest side of the Capitol," *id.*; *see also* Gov't's Ex. 13 (image of defendants among crowd amassed by Capitol scaffolding), before entering the Capitol building, around which had been placed "[t]emporary and permanent barricades," Defs.' SOF ¶ 4. As defendants walked toward the Senate Wing Door, "a group of uniformed officers were visibly protecting another entry point into the Capitol Building,"

37

*id.* ¶ 14, and the "alarm system was audibly blaring as [defendants] entered the Building," *id.* ¶ 15. Given the barricades surrounding the Capitol, the scaffolding defendants scaled to enter the Capitol building, the presence of uniformed officers protecting an entry point to the Capitol Building, and the alarm sounding, indicia of "visible or physical restrictions," Defs.' MIL at 2, were more than sufficient to define the area as "otherwise restricted" within the meaning of Section 1752 while defendants were engaging in their offense conduct.

### 3. Section 1752 Is Neither Unconstitutionally Vague Nor an *Ex Post Facto* Law, and Lenity Does Not Apply

Relying on their arguments that, on January 6, 2021, the Capitol and its grounds were not "restricted," within the meaning of Section 1752, defendants contend that Counts Two and Three are unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause and must, in any event, be dismissed by application of the rule of lenity and the "novel construction principle." Defs.' MTD at 14–22. These same arguments have been uniformly rejected by other Judges on this Court, and, again, fail here.[11]

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Fischer*, 64 F.4th at 342 (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). This is a stringent standard. Unconstitutional vagueness arises only if the statute "specifie[s] 'no standard of conduct at all.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)).

---

[11]     *See Grider*, 617 F. Supp. 3d at 53–54 (Kollar-Kotelly, J.); *United States v. Puma*, 596 F. Supp. 3d 90, 113 n.6 (D.D.C. 2022) (Friedman, J.); *United States v. Bozell*, No. 21-cr-216 (JDB), 2022 WL 474144, at *9 (D.D.C. Feb. 16, 2022) (Bates, J.); *United States v. Nordean*, 579 F. Supp. 3d 28, 60 (D.D.C. 2021) (Kelly, J.); *Griffin*, 549 F. Supp. 3d at 57 (McFadden, J.); *United States v. Caputo*, 201 F. Supp. 3d 65, 72 (D.D.C. 2016) (Cooper, J.).

Defendants contend, first, that "there is *no* notice, much less 'fair notice,' of the conduct proscribed *in this case*" under "the government's interpretation of § 1752" that an area need not be restricted by the USSS in order for it to be designated a "restricted building or grounds." Defs.' MTD at 15 (emphasis in original). To the contrary, for reasons explained, *supra*, in Part III.B.1, Section 1752 is clear and unambiguous, and "[f]rom the plain text, an ordinary person [would] [be] on notice that § 1752 covers any 'restricted area . . . of a building or grounds" without regard to whether the USSS was the entity imposing the restrictions. *United States v. Neely*, No. 21-cr-642 (JDB), 2023 WL 1778198, at *4 (D.D.C. Feb. 6, 2023) (quoting 18 U.S.C. § 1752(c)); *United States v. Nordean*, 579 F. Supp. 3d 28, 60 (D.D.C. 2021) ("The text is clear and gives fair notice of the conduct it punishes, and it is not standardless enough to invite arbitrary enforcement.").

Nor does the statute lead to arbitrary or discriminatory enforcement, which defendants contend is "underlined by the patently political nature of the circumstances of the offense" and "the criminalization of [defendants'] First Amendment rights," *see* Defs.' MTD at 16–17 (citations omitted), where, as applied to defendants, the parties stipulate that defendants unlawfully "entered the Capitol," a "restricted area on January 6, 2021," around which area "[t]emporary and permanent barricades" had been placed, Defs.' SOF ¶¶ 4, 13, 15.[12] Moreover, defendants'

---

[12] Defendants' suggestion that their conduct on January 6, 2021, was First Amendment-protected activity, *see* Defs.' MTD at 17, 25, is incorrect, where defendants did not engage in expressive conduct, *see Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment." (citation omitted)); *accord Nordean*, 579 F. Supp. 3d at 53 ("applying Section 1512(c)(2) to defendants does not violate the First Amendment" where "the conduct with which Defendants are charged is" not "protected by the First Amendment at all" (capitalization and citations omitted)). As the parties stipulated and as supplemented by the government's exhibits submitted at trial, defendants "entered the Capitol without lawful authority" to do so, "joined the crowd" in the Capitol "as it overwhelmed the USCP officers who were attempting to prevent the rioters from entering further into the Capitol," and "joined a crowd as it amassed near the Rotunda Door," while defendant Carnell "chanted 'TREASON, TREASON, TREASON.'" Defs.' SOF ¶¶ 15–17; Gov't's Ex. 15.1 (CCTV footage of defendants' entry through Senate Wing Doors); Gov't's Ex. 17.1 (photo of defendant Carnell in the Rotunda). This conduct disrupted the Joint Session of Congress for hours and required the evacuation of Members of Congress and the Vice President. Defs.' SOF ¶ 7. This conduct was criminal and was "not expressive conduct." *Bingert*, 605 F. Supp. 3d at 130–31 (holding Section 1752(a)(1) constitutional as applied to defendants' conduct on January 6, 2021).

assertion that "prior to January 6, [the government] had never prosecuted a violation of [Section 1752] with the allegation that the accused entered an area restricted by some government agency other than the USSS," Defs.' MTD at 16–17, if correct, is immaterial, for "[d]iscretionary prosecutorial decisions cannot render vague as applied a statute that by its plain terms provides fair notice," *United States v. Caldwell*, 581 F. Supp. 3d 1, 16 (D.D.C. 2021) (rejecting vagueness challenge under 18 U.S.C. § 1512(c)(2)); *see also Kincaid v. Gov't of D.C.*, 854 F.3d 721, 729 (D.C. Cir. 2017) ("[T]he presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague.").

Defendants next argue that Section 1752(a)(2)'s phrase "'within such proximity to' is an unconstitutionally vague boundary standard as applied to the defendant[s]," insofar as the "government has not properly alleged that the west front of the Capitol steps was a restricted area under § 1752(c)." Defs.' MTD at 17. Defendants disregard, however, "the explicit language of the Indictment," which alleges that defendants were "not just 'within such proximity' to a restricted area but [were] in fact within a restricted area," Gov't's Opp'n MTD at 10 (emphasis omitted); *see* Indictment at 2 (Count Three alleging that defendants "engage[d] in disorderly and disruptive conduct *in* and within such proximity to, a restricted building and grounds" (emphasis supplied)). As other Judges on this Court have found in rejecting this same argument, the "'proximity to' language merely describes the outer bounds of where a violation may take place," *Puma*, 596 F. Supp. 3d at 113 n.6, and "whatever fuzzy boundary standard[] that phrase may introduce is irrelevant here," *Nordean*, 579 F. Supp. 3d at 60 n.16 (quotation marks and citation omitted) (brackets in original); *see also Neely*, 2023 WL 1778198, at *5 ("[Defendant] challenges only the phrase 'within such proximity to,' which merely describes the outer bounds of where a violation

40

may take place. . . . The motion [] gives the Court no basis to find § 1752(a)(2) unconstitutionally vague." (quotation marks and citation omitted)).

Related to their vagueness challenge, defendants contend that the rule of lenity and the "novel construction principle" require "resolv[ing] any ambiguities in [their] favor," where the government's interpretation "would operate as an *ex post facto* law in violation of the Due Process Clause." Defs.' MTD at 20–22. These arguments fail for the same reason as do defendants' vagueness challenges—"the statute is not ambiguous." *Neely*, 2023 WL 1778198, at *4 n.2 (citations omitted).

"The rule [of lenity] [] applies only when a criminal statute contains a grievous ambiguity or uncertainty, and only if, after seizing everything from which aid can be derived, the Court can make no more than a guess as to what Congress intended." *Fischer*, 64 F.4th at 350 (quotation marks and citations omitted). Defendants' "ability to articulate a narrower construction of the statute does not trigger lenity," *Griffin*, 549 F. Supp. 3d at 58 (quotation marks and brackets omitted) (quoting *Smith v. United States*, 508 U.S. 223, 239 (1993), and that is all defendants have done here.

Nor does Section 1752 operate as an *ex post facto* law in violation of the Fifth Amendment's Due Process clause under the "novel construction principle." Defs.' MTD at 21–22. "Generally, to prevail on [an] *ex post facto* challenge, a defendant must show some break with precedent." *Grider*, 617 F. Supp. 3d at 54 (citing *Williams v. Filson*, 908 F.3d 546, 577 (9th Cir. 2018), and *Griffin*, 549 F. Supp. 3d at 58); *see also Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) ("[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids."). Merely because the government is applying Section 1752 to the riot that occurred at the United

41

States Capitol and caused a lengthy disruption in the Joint Session of Congress convened to certify the 2020 presidential election for the first time in our country's history, does not mean this statute was "unexpectedly broaden[ed]," *Nordean*, 579 F. Supp. 3d at 60, or that these defendants are unfairly blindsided, since this was an unprecedented occurrence, *see Grider*, 617 F. Supp. 3d at 54 (rejecting argument that "reading . . . [Section] 1752 to apply to the conduct charged would effect an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment"). In short, defendants' fundamental complaint that Section 1752 is not regularly applied to conduct like theirs is not due to the unambiguous text of the statute but instead to the unprecedented nature of defendants' conduct at the U.S. Capitol on January 6, 2021.

## C. But-For Causation

In their final argument, defendants contend that use of the term "in fact" in Section 1752(a)(2) demands proof that defendants' "actions were a but-for cause . . . that impeded or disrupted the orderly conduct of Government business or official functions." Defs.' MIL at 6. As support, defendants rely on *Burrage v. United States*, 571 U.S. 204 (2014), in which the Supreme Court recognized that phrases such as "results from," "because of," "based on," and "by reason of," have "regularly [been] read . . . to require but-for causality," *id.* at 212–13, to hold that "a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C)"—triggered when "'death or serious bodily injury results from the use of'" a Schedule I or II drug—"unless such use is a but-for cause of the death or injury," *id.* at 206, 218–19 (quoting 21 U.S.C. § 841(a)(1), (b)(1)(A)–(C) (2012)). This reliance on *Burrage* is misplaced.

The Supreme Court in *Burrage* explained that "courts have not always required strict but-for causality, even where criminal liability is at issue," in circumstances where, for example, "multiple sufficient causes independently, but concurrently, produce a result." *Id.* at 214 (emphasis and citations omitted). "In determining whether but-for causation is required, the Court

42

looks both to text and context." *United States v. Rivera*, 607 F. Supp. 3d 1, 9 n.15 (D.D.C. 2022), *aff'd*, No. 22-3088, 2023 WL 8594077 (D.C. Cir. Dec. 12, 2023) (citing *Burrage*, 571 U.S. at 213, and *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 768–69 (2018)).

Following this direction in *Burrage* to examine the text, Section 1752(a)(2) penalizes, in relevant part, one who "knowingly . . . engages in disorderly or disruptive conduct . . . so that [] such conduct, *in fact*, impedes or disrupts the orderly conduct of Government business or official functions." 18 U.S.C. § 1752(a)(2) (emphasis supplied). By contrast, the Controlled Substances Act "imposes a 20-year mandatory minimum sentence on a defendant who unlawfully distributes a Schedule I or II drug, when 'death or serious bodily injury *results from* the use of such substance.'" *Burrage*, 571 U.S. at 206 (emphasis supplied) (quoting 21 U.S.C. § 841(a)(1), (b)(1)(A)–(C)). Section 1752(a)(2) contains no language similar to "results from" that has been "regularly read . . . to require but-for causality," *id.* at 212. *See Ballenger*, 2023 WL 4581846, at *7 ("[T]he text of § 1752(a)(2) contains no language . . . such as 'results from' or 'because of,'" "that would suggest but-for causation." (quotation marks omitted) (quoting *Rivera*, 607 F. Supp. 3d at 9 n.15)). Contrary to defendants' suggestion that Section 1752(a)(2)'s use of the phrase "in fact" requires but-for causation, *see* Defs.' MIL at 5–7, the plain meaning of "in fact," defined as "in reality" or "actually," *In Fact*, OXFORD ENGLISH DICTIONARY, https://perma.cc/X3WB-XAYP (last visited Feb. 14, 2024), or "resulting from the acts of parties rather than by operation of law," *In Fact*, BLACK'S LAW DICTIONARY (11th ed. 2019), "requires at most that Defendants' conduct actually disrupt the proceedings, not that the disruption be traceable solely to them," *Ballenger*, 2023 WL 4581846, at *7 (citing dictionary definition of "in fact"). Defendants' preferred construction "would have the Court add an additional requirement to the statute's causation clause, mandating that a defendant be the *but for* cause of a disruption[,]" *Rivera*, 607 F. Supp. 3d at 9

43

(emphasis in original), but Section 1752(a)(2) contains "no such term," *id.* Rather, "[t]he open-endedness of" Section 1752(a)(2) "allows the adoption of a demanding but still practicable causal standard," *Ballenger*, 2023 WL 4581846, at *7 (quotation marks omitted) (quoting *Maslenjak v. United States*, 582 U.S. 335, 351 (2017)), by requiring that defendants' actions "in part caused the continued interruption to Congressional proceedings," *Rivera*, 607 F. Supp. 3d at 9.

Defendants' conduct plainly satisfies this standard where, as stipulated by the parties and as supplemented by the government's exhibits at trial, defendants entered the Capitol building in an unorthodox and unsecured manner, through a breached door, and joined crowds overwhelming police at various locations inside the Capitol and joined other unauthorized individuals in the Senate chamber, all while the Congress was supposed to be meeting, and did not leave the Capitol until 2:56 p.m., after being "directed to exit the Capitol by uniformed law enforcement officers." Carnell's SOF ¶ 21; Bowman's SOF ¶ 23; *see also* Gov't's Ex. 21 (Carnell); Ex. 23 (Bowman) (CCTV footage of the Senate Carriage door). As stipulated, "Congressional proceedings could not resume until after *every* unauthorized occupant had been removed from or left the Capitol." Defs.' SOF ¶ 7 (emphasis supplied); *see also Rivera*, 607 F. Supp. 3d at 9 ("[E]ven the presence of *one* unauthorized person in the Capitol [was] reason to suspend Congressional proceedings." (emphasis in original)).[13] Defendants' conduct thereby, in fact, impeded and disrupted the orderly

---

[13] In a last-ditch argument, defendants make the unfounded assertion that the USCP "lifted the restricted area for anyone seeking to protest" and that "protestors [had] removed signs, barricades and snow fencing" by the time defendants arrived, such that defendants believed their "free speech assembly" was authorized. Defs.' MTD at 22–26. This assertion fails for both factual and legal reasons. First, this assertion contradicts the facts to which defendants stipulated, *i.e.*, that they "enter[ed] the *restricted area* on Capitol Grounds and climbed through scaffolding on the northwest side of the Capitol." Defs.' SOF ¶ 13 (emphasis supplied). Second, this assertion is fact-based and thus is improper on a motion to dismiss because it raises no "defect in the indictment." FED. R. CRIM. P. 12(b)(3)(B); *see United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) ("Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969))). More fundamentally, as discussed *supra* n.12 and defendants' claims notwithstanding, *see* Defs.' MTD at 17, 25, defendants' conduct on January 6, 2021, was not First Amendment-protected activity.

conduct of the official congressional proceeding to certify the results of the 2020 presidential election.

## IV. CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss Counts Two and Three of the Indictment, ECF No. 53, and defendants' Motion *in Limine* As to Counts Two and Three, ECF No. 42, are DENIED.

An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: February 15, 2024

_____

**BERYL A. HOWELL**
United States District Court Judge